# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

## Alexandria Division

| | |
|---|---|
| **Johnnie R. Simmons, Jr.,** ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | 1:20cv520 (TSE/JFA) |
| ) | |
| **Dale Moreno, et al.,** ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

Johnnie R. Simmons, Jr. ("Plaintiff" or "Simmons"), a former[1] Virginia inmate proceeding pro se, filed a this civil-rights suit under 42 U.S.C. § 1983, alleging defendants Dr. Dale Moreno and Jennifer Hodge, N.P. (or "Defendants") were deliberately indifferent to his serious medical need (epilepsy) while he was incarcerated at the Hampton Roads Regional Jail ("HRRJ"). [Dkt. No. 7]. On November 15, 2020, the defendants filed a motion for summary judgment with supporting exhibits and affidavits. [Dkt. No. 32, 33]. Plaintiff received the notice required by Local Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) [Dkt. No. 43], and he has responded. [Dkt. Nos. 39, 44, 66]. Thus, the motion is ripe for disposition. For the reasons that follow, defendants' motion must be granted.

Plaintiff alleges three instances of deliberate indifference to his serious medical need (epilepsy). First, the defendants discontinued one of Plaintiff's seizure medications (Dilantin) on June 23, 2019, which resulted in his having a seizure on July 3, 2019. [Dkt. No. 7 at 4]. Second, Plaintiff claims that the defendants intentionally delayed his transport to the emergency room at Bon Secours Maryview Medical Center ("Maryview") on July 3, 2019 in the hope that the plaintiff would "expire." [Id. at 5]. Lastly, that after Plaintiff was discharged from Maryview at a

---

[1] Simmons was released from custody on May 11, 2021. [Dkt. No. 60].

400 mg/day dosage of Dilantin, the defendants reduced his Dilantin dosage to 200 mg/day. [Id. at 8]. Defendants motion for summary judgment asserts that they were not deliberately indifferent to Plaintiff's medical needs and used their best medical judgment when treating his seizure condition.[2] In response, Plaintiff presents argument, unsupported by facts, asserting that he was intentionally denied Dilantin; select portions of his medical records from Maryview; and he reiterates his assertion that when he had a seizure on July 3, 2019, the Defendants delayed treatment hoping he would "expire." The sworn statements of the Defendants and the HRRJ medical records establish that the decision to discontinue the Dilantin on June 23, 2019 was based upon a June 13, 2019 blood test that indicated possible Dilantin toxicity, and was a proper exercise of medical judgment. The sworn statements and medical records also establish that the defendants did not intentionally delay sending plaintiff to Maryview on July 3, 2019. Finally, the decrease in the Dilantin dosage after plaintiff returned to HRRJ from 400 mg/day to 200 mg/day was not deliberate indifference but the exercise of medical judgment.[3]

---

[2] Plaintiff filed a pleading on June 24, 2021 that seeks to raise a new claim about his Depakote level (Valproic acid) alleging the Maryview medical records indicate his level was "low" when his blood was tested on July 3, 2019. [Dkt. No. 66 at 3]. Plaintiff infers he has only recently learned of the "low" Depakote level, but he submitted records from Maryview on November 12, 2020 that contain the same information. [Dkt. No. 30 at 3, 5]. A claim raised in opposition to a motion for summary judgment is not properly before the Court. See Klein v. Boeing Co., 847 F. Supp. 838, 844 (W.D. Wash. 1994). Plaintiff cannot amend his complaint by raising new matters in a response to a motion. See Hurst v. District of Columbia, 681 F. App'x 186, 194 (4th Cir. 2017) ("a plaintiff may not amend her complaint via briefing") (citing Commonwealth of Pennsylvania v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988)). Because the claim is not properly before the Court, it will not be addressed here.

[3] Plaintiff has filed numerous motions seeking extensions of time to gather evidence to respond to the motion for summary judgment, as well as motions for the Court to order documents be provided to him. The Court granted the motions for extension of time and denied the motions related to discovery without prejudice because they were not served on the defendants. [Dkt. No. 47]. In addition, although Plaintiff sought orders directing that he be provided medical records from his treatment at Maryview on July 3, 2019, he has submitted copies of selective portions of his medical records from that visit with pleadings filed in this civil action [Dkt. Nos. 30, 31, 39, 44-2, 44-3]; and he has admitted in his June 24, 2021 pleading that he had obtained the Maryview medical records after his release form custody on May 11, 2021. [Dkt. No. 66 at 2-3]. By Order entered June 2, 2021, the Court granted plaintiff a final extension of fourteen days from that date to submit sworn statements and authenticated documents for consideration. Despite having been out of custody for over two months, he has submitted no sworn statements or affidavits from Maryview medical staff involved in his treatment on July 3, 2019 that would confirm the hearsay he has alleged or his claim of deliberate indifference.

## I. Undisputed Facts

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, set forth a statement of material facts that defendants contend are undisputed. Plaintiff's response [Dkt. Nos. 39, 44, 56, 66] does not comply with his obligations under those Rules by submitting statements of undisputed and disputed facts. Instead, he has submitted a largely incoherent response that refers to another civil action he has filed, irrelevant matters (jail credit requests from the Virginia Department of Corrections), contains annotated medical records, includes hearsay instead of sworn statements, and fails to identify the facts that he disputes or the basis therefore. The following are the undisputed facts based upon review of the motion for summary judgment, the unobjected to medical records, and Plaintiff's sworn submissions.[4]

1. Simmons was committed to the Hampton Roads Regional Jail ("HRRJ") on May 16, 2019, and released on from HRRJ on July 22, 2019. [Dkt. Nos. 33-1 at 2, 21; 33-2 at ¶ 3].

2. Defendant Dr. Moreno served as a treating physician for inmates and detainees at HRRJ under a contract with Wellpath, LLC ("Wellpath"), and treated Plaintiff for his seizure disorder from May 16, 2019 to July 22, 2019. [Dkt. No. 33-2 at ¶ 1].

---

[4] The amended complaint [Dkt. No. 7] and Plaintiff's responses [Dkt. Nos. 44, 56, 66] are not sworn. Plaintiff's response in opposition [Dkt. No. 39] is sworn. The Court has also considered the unobjected to documents from Maryview Hospital submitted by Plaintiff. Under Fed. R. Civ. P. 56(c)(3), a court can refer to other materials in the record (as opposed to only cited materials) when deciding a motion for summary judgment. See United States v. Sims, 578 F. App'x 218, 222 (4th Cir. 2014) (district court may consider evidence that movant did not reference in its motion for summary judgment) (citing Fed. R. Civ. P. 56(c)(3); see, e.g., Green v. Northport, 599 F. App'x 894, 895 (11th Cir. 2015) (unpublished) ("district court could consider the record as a whole to determine the undisputed facts on summary judgment"); Ayazi v. United Fed'n of Teachers Local 2, 487 F. App'x 680, 681 (2d Cir. 2012) (unpublished) ("when assessing a summary judgment motion, a District Court 'may consider other materials in the record.' Thus, there was no error in the magistrate judge considering and relying on evidence not specifically cited by the [summary-judgment movant] ....") (quoting Fed. R. Civ. P. 56(c)(3)).

3

3. Dr. Moreno is familiar with the facts of Plaintiff's medical treatment through his role as his physician at HRRJ and by reviewing the relevant medical records. [Id. at ¶¶ 2, 3].

4. Through his training and active clinical practice in treating patients with seizure disorders, Dr. Moreno knew the standard of care that applied to physicians and nurse practitioners during 2019 for treating seizure disorders similar to Plaintiff's with medication and for responding to patients who are having seizures. [Id. at ¶ 4].

5. Nurse Hodge is a licensed nurse practitioner ("NP") [Dkt. No. 33-3 at ¶ 1], has treated inmates and detainees at HRRJ under a contract with Wellpath, and was one of the providers who treated Plaintiff for his seizure disorder in 2019. [Id.].

6. Nurse Hodge is familiar with the facts of Plaintiff's medical treatment through her role as Plaintiff's NP at HRRJ and by reviewing the relevant medical records. [Id. at ¶ 2].

7. Through her training and active clinical practice in treating patients with seizure disorders Nurse Hodge knew the standard of care that applied to NPs during 2019 for treating seizure disorders similar to Plaintiff's with medication and for responding to patients who are having seizures.[Id. at ¶ 3].

*Medical Facts*

8. During his intake interview on May 16, 2019, Dr. Moreno evaluated Plaintiff and noted that he had epilepsy and prescribed Depakote, Vimpat, and Dilantin because he believed they would help reduce Plaintiff's risk of seizures. [Dkt. Nos. 33-1 at 1, 2-12; 33-2 at ¶ 5]. Each of the medications are used to treat seizure disorders. [Dkt. Nos. 33-2 at ¶ 5; 33-3 at ¶ 4].

9. Plaintiff's medication records show he was prescribed Depakote, Vimpat, and Dilantin from June 1-23, 2019. [Dkt. Nos. 33-1 at 7-8; 33-2 at ¶ 6].

10. On June 23, 2019, Plaintiff's Dilantin was discontinued because a June 13, 2019 blood serum test showed that his Dilantin levels were at 30 [Dkt. No. 33-1 at 14], which created a risk of coma. [Dkt. Nos. 33-2 at ¶ 7; 33-3 at ¶ 5]. Based on their training and medical judgment, Defendants discontinued Plaintiff's Dilantin prescription on June 23, 2019 to allow Plaintiff's Dilantin levels to come down to a "safer range," but continued to treat his seizure disorder with Depakote and Vimpat from June 23, 2019 through his discharge on July 22, 2019 in accordance with the standard of care. [Dkt. Nos. 33-2 at ¶¶ 7, 8; 33-3 at ¶¶ 5, 6].

11. From June 23, 2019 until Plaintiff's release from HRRJ on July 22, 2019, Nurse Hodge and Dr. Moreno treated Plaintiff's seizure disorder with both Depakote and Vimpat and, believed that Vimpat and Depakote were sufficient to manage his risk of seizure at the time. [Dkt. Nos. 33-1 at 2-13, 33-2 at ¶ 8; 33-3 at ¶ 6]. Nurse Hodge and Dr. Moreno each believed that discontinuing Plaintiff's Dilantin while continuing to treat his seizure disorder with Vimpat and Depakote was the safest course of anticonvulsant therapy at that time and that they were complying with the standard of care. [Id.].

12. On July 3, 2019, Plaintiff was found lying on his back with his eyes closed at 9:20 a.m. [Dkt. No. 33-3 at ¶ 7]. Two minutes later, medical personnel arrived and began verbal and tactile stimulation to help orient Plaintiff so that he could be brought to the medical unit. [Id.]. At 10:05 a.m., Plaintiff was given his morning medication in the medical unit, where he was observed and assessed by Dr. Moreno. [Dkt. Nos. 33-2 at ¶ 9; 33-3 at ¶ 7].

13. At 11:05 a.m., Plaintiff began to suffer "consecutive seizures." Dr. Moreno initiated the emergency transport protocol and Nurse Hodge called 911 for an ambulance to transport him from HRRJ to the emergency department at Maryview. [Dkt. Nos. 33-2 at ¶ 9; 33-3 at ¶ 7].

5

14. Plaintiff arrived at Maryview at 11:53 a.m. [Dkt. Nos. 39 at 8; 39-1 at 5]. A Maryview doctor ordered blood tests at 11:55 a.m. and that various medications (magnesium, Keppra, Dilantin) be given to Plaintiff. [Dkt. No. 39-1 at 7]. Plaintiff informed the doctor that he had a seizure that morning and had been given Depakote and Vimpat after the seizure. Plaintiff also told the doctor at Maryview that he was "on Dilantin and ha[d] not had his level checked recently...." [Dkt. Nos. 30 at 2; 66-1 at 5]. At 12:05 p.m., the Maryview doctor also ordered valproic acid [id.], and a chest x-ray was performed at 12:08 p.m. Treatment by medical personnel at Maryview began at 12:20 p.m. [Id. at 4].

15. The medical records of his triage at 12:18 p.m., indicate that Plaintiff arrived from HRRJ after having had "two seizures" that day, only one of which was "witnessed." [Dkt. No. 66 at 4]. The Maryview medical records indicate the nurse conducting the triage found that Plaintiff was "lethargic," but "A&OX4" [Dkt. No. 66-1 at 4], which is shorthand for a person's cognitive status and "refers to person, time, place, and situation."[5]

16. At Maryview, providers prescribed anticonvulsants, including Dilantin, for plaintiff. [Dkt. No. 33-3 at ¶ 7]. Maryview, however, was unsuccessful in administering the Dilantin by IV and a 400mg dose was administered by oral capsule at 4:59 p.m. [Dkt. Nos. 39-1 at 2; 30 at 3],

---

[5] See https://doctorlingo.com/definition/alert-and-oriented-x4 (last viewed July 7, 2021). Plaintiff alleged in his June 24, 2021 pleading that he was "near death". [Dkt. No. 66 at 1, 2]. The Maryview medical records, however, describe Plaintiff's condition as "lethargic," but alert and orientated as to person, time, place, and situation. See Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016) (citations omitted) (in considering a dispositive motion, a court may "consider documents that are explicitly incorporated into the complaint by reference ... and those attached to the complaint as exhibits," as well as any document submitted by the movant if the document was "integral to the complaint and there is no dispute about the document's authenticity."); Fare Deals, Ltd. v. World Choice Travel.com, Inc., 180 F. Supp. 2d 678, 683 (D. Md. 2001) ("the court may also consider any documents referred to in the complaint and relied upon to justify a cause of action-even if the documents are not attached as exhibits to the complaint"); see, e.g., Spencer v. Abbott, 731 F. App'x 731, 737-38 (10th Cir. 2017) (no error in district court's consideration of evidence in the record not specifically cited by the summary-judgment movant) (citing Rule 56(c)(3)); see supra note 4; cf. Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991) ("in the event of conflict between the bare allegations of the complaint and any exhibit attached pursuant to Rule 10(c), Fed. R. Civ. P., the exhibit prevails").

just over five hours after Plaintiff arrived at Maryview.[6] Plaintiff was discharged at 5:36 p.m. and returned to HRRJ, where he was noted to have "no acute signs of distress or complaints" and told the non-party HRRJ medical provider that he felt "much better" and had been given a dose of Dilantin before he left Maryview. [Dkt. No. 33-1 at 17; 39-1 at 12].[7]

17. After Plaintiff returned from Maryview, Nurse Hodge reevaluated his anticonvulsant regimen to lower his risk and frequency of additional seizures. [Dkt. No. 33-3 at ¶ 8]. Based on his medical history and her knowledge and training in prescribing seizure medication, on July 5, 2019, she ordered Plaintiff placed back on Dilantin [id.], but at 200 mg/day rather than the 400 mg/day in Plaintiff's discharge instructions. [Dkt. Nos. 33-1 at 2; 33-3 at ¶ 8]. Nurse Hodge prescribed the 200 mg/day dose because Plaintiff's Dilantin levels had risen to 30 under the prior 400 mg/day dose. [Dkt. No. 33-3 at ¶ 8]. In Nurse Hodge's medical judgment, prescribing a 400 mg/day dose again would create an unjustified risk of coma and that a 200 mg/day dose was clinically indicated to achieve therapeutic levels with a lower risk of overdose. [Id.].

18. From July 5 through his discharge from HRRJ on July 22, 2019, Plaintiff was given 200 mg/day of Dilantin, in addition to his Depakote and Vimpat, for his seizure disorder,

---

[6] The Maryview records submitted by Plaintiff negate Plaintiff's allegation that the Dilantin he received at Maryview was administered by IV. The Maryview records establish a nurse attempted to start an IV at 12:20 p.m. in Plaintiff's right antecubital (elbow), but it was removed at 2:35 p.m. due to difficulty in administering the IV because of scar tissue. [Dkt. No 66-1 at 3]. At 3:00 p.m., the nurse attempted to start an IV on Plaintiff's left hand, was unsuccessful, and the IV was removed at 3:15 p.m.. The IV was restarted at 4:05 p.m., and then stopped at 4:15 p.m. [Dkt. No. 39-1 at 2, 4]. The progress notes indicate that Plaintiff was "unable to tolerate the Dilantin IV" and that Plaintiff was given a 400 mg dose orally at 4:59 p.m. [Dkt. No. 30 at 3]. The Maryview records also establish that Plaintiff "pulled out the [IV] line" at 3:15 p.m. [Dkt. No. 39-1 at 4]. See supra notes 4 and 5.

[7] Plaintiff asserts his Dilantin level on July 3, 2019 at Maryview was 0%, but provides no evidence to support his assertion. To the contrary, the July 3, 2019 Maryview medical records plaintiff submitted indicate that his Dilantin level that day was "0.9" [Dkt. No. 30 at 5], the progress notes indicate that his "Dilantin" was only "low," and that Maryview would "load with Dilantin here." [Dkt. No. 30 at 3]. Plaintiff cites numerous hearsay statements by Maryview medical providers, but he submitted no sworn statements. Further, the Maryview records plaintiff did submit do not indicate if Maryview medical personnel were aware of the June 13, 2019 test results indicating that plaintiff's Dilantin level was at 30, which exceeded "the published reference range" and stated that plaintiff should be "clinically evaluated for signs of potential toxicity." [Dkt. No. 33-1 at 15]. The June 24, 2021 response reiterates the claim that Plaintiff's Dilantin level was 0% when he was admitted to Maryview on July 3, 2019, but is refuted by plaintiff's own exhibit attached to the response. [Dkt. Nos. 66 at 1, 66-1 at 1]. See supra notes 4 and 5.

which complied with the standard of care. [Dkt. Nos. 33-1 at 2; 33-2 at ¶ 10; 33-3 at ¶ 8].

19. On the morning of July 22, 2019, Plaintiff was found lying on the floor of his cell, where he was treated and brought to medical for evaluation by a non-party nurse. [Dkt. No. 33-1 at 17-18]. Later that day, Plaintiff was released from HRRJ. [Id. at 19]. As part of his discharge, Plaintiff was provided the remainder of his seizure prescriptions, with instructions on their use after his release. [Id. at 20].

## II. Standard of Review

It is well settled that a motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

Where, as in this case, the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the non-movant's claim. See Celotex, 477 U.S. at 323-25. In response to such a showing, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist that must be resolved at trial. See id. at 324; Anderson, 477 U.S. at 248. The party who bears the burden of proving a particular element of a claim must "designate 'specific facts showing there is a genuine issue for trial'" with respect to that element. Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

In reviewing the record on summary judgment, the Court "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." Brock v. Entre Computer Ctrs., Inc., 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

The non-moving party, however, must show more than some metaphysical doubt as to the material facts. "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial.'" Hughes v. Bedsole, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting Anderson, 477 U.S. at 256). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. See Anderson, 477 U.S. at 249-50. There must be evidence on which the jury could reasonably find for the non-moving party. Id. at 252. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the opposing party is entitled to a verdict.

When a defendant moves for summary judgment on ground that plaintiff lacks evidence of an essential element of his claim, plaintiff is required, if he wants to ward off grant of the motion, to present evidence of evidentiary quality (either admissible documents or attested testimony, such as that found in depositions or in affidavits) demonstrating existence of genuine issue of material fact; evidence need not be in admissible form, but it must be admissible in content, in sense that change in form but not in content, would make evidence admissible at trial. See Celotex, 477 U.S. at 324. Hearsay "is neither admissible at trial nor supportive of an

9

opposition to a motion for summary judgment." Greensboro Professional Firefighters Ass'n v. City of Greensboro, 64 F.3d 962, 967 (4th Cir. 1995). Such "second-hand" information learned from others fails to satisfy a plaintiff's burden "to survive a motion for summary judgment." Monk v. Potter, 723 F. Supp. 2d 860, 875, 878 (E.D. Va. 2010) (citing Greensboro, 64 F.3d at 967; Riggs v. Airtran Airways, Inc., 497 F.3d 1108, 1121 (10th Cir. 2007) (noting statements conveyed to plaintiff were "second-hand" and inadmissible hearsay in opposition to summary judgment); Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 89-90 (D.D.C. 2006) (purported events related by plaintiff in her own deposition were based on second-hand information rather than personal knowledge and were therefore inadmissible hearsay for summary judgment purposes); Fed. R. Civ. P. 56(e) (supporting or opposing summary judgment affidavits must be based on "personal knowledge")).

### III. Analysis

An Eighth Amendment claim relating to medical care in prison requires a plaintiff to "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). Thus, plaintiff must allege two distinct elements to support a claim. First, he must allege a sufficiently serious medical need that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

Second, a plaintiff must allege that the defendant was deliberately indifferent to his serious medical need. Farmer v. Brennan, 511 U.S. 825, 837 (1994). An assertion of mere negligence or even malpractice is not sufficient to state an Eighth Amendment violation. See Estelle, 429 U.S. at 106. Instead, "an official acts with deliberate indifference if he had actual

knowledge of the prisoner's serious medical needs and the related risks, but nevertheless disregarded them." DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018). Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). Absent exceptional circumstances, a plaintiff cannot establish a cognizable deliberate indifference claim when there exists a mere disagreement between the plaintiff and the state official over the proper medical care. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Finally, the Fourth Circuit has also recently held that "disagreement among reasonable medical professionals is not sufficient to sustain a deliberate indifference claim." Hixon v. Moran, No. 19-1209, 2021 U.S. App. LEXIS 18077, *11, ___ F.3d ___, ___ (4th Cir. June 17, 2021); Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006) (finding that a mere difference of opinion between doctors is insufficient to show deliberate indifference); Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation).

Here, the defendants concede for purposes of this motion that Plaintiff's epilepsy is a serious medical condition. [Dkt. No. 33 at 8] (citing Heyer v. U.S.B. P., 849 F.3d 202, 210 (4th Cir. 2017) (court found that "seizures are sufficiently serious to require medical treatment.")). Accordingly, the summary judgment motion focuses on the discontinuance of Dilantin on June 23, 2019, the delay in his treatment on July 3, 3019, and the decrease in the Dilantin dosage from 400 mg/day to 200 mg/day on July 5, 2019 (which continued until his release from HRRJ on July 22, 2019).

11

*A. Discontinuing Dilantin on June 23, 2019*

On June 23, 2019, after reviewing the results of the June 13, 2019 blood test, the Defendants discontinued Plaintiff's Dilantin prescription because his blood serum test showed that his Dilantin level was "30," which put him at risk of a coma. [Dkt. No. 33-1 at 14]. Although the Dilantin was discontinued, Plaintiff still received Depakote and Vimpat to treat his seizure disorder [Dkt. Nos. 33-2 at ¶ 8; 33-3 at ¶ 6] while his Dilantin levels were allowed to come down to a "safer range." [Dkt. No. 33-3 at ¶ 5]. The medical records establish that the Defendants exercised medical judgment based upon a test result and maintained an alternative course of treatment for Plaintiff's seizures.[8] Plaintiff has neither produced nor submitted any evidence that calls into question the Defendants medical judgment. See Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) ("[A] party cannot withstand summary judgment by relying solely on his own self-serving allegations unsupported by any corroborating evidence.").

Plaintiff's disagreement with the change in his treatment program on June 23, 2019 does not rise to the level of an Eighth Amendment violation. See United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011).[9] At best, the decision to discontinue the Dilantin was an exercise of medical judgment that may give rise to a negligence claim. See Miltier v. Beorn, 896 F.2d 848, 851-52 (4th Cir. 1990) ("mere negligence; or malpractice does not violate the Eighth

---

[8] See Ledoux v. Davies, 961 F.2d 1536, 1537 (10th Cir. 1992) (noting that types of medication prescribed are generally matters of medical judgment); see also Russell v. Sheffer, 528 F.2d 318, 318 (4th Cir. 1975) (a doctor's medical judgment is "not subject to judicial review").

[9] See Jackson v. Sampson, 536 F. App'x 356, 357 (4th Cir. 2013) (physician's "decision not to authorize the particular treatment program [Plaintiff] requested ... amounts to a disagreement with his course of treatment that is not cognizable under the Eighth Amendment."); Johnson v. Treen, 759 F.2d 1236, 1238-39 (5th Cir. 1985) (simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation); Price v. Reilly, 697 F. Supp. 2d 344, 360, 361 (E.D.N.Y. 2010) ("mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference," and the fact that the defendants adjusted the dosage of plaintiff's medication in response to test results is "inconsistent with deliberate indifference"); see also Phillips v. Jasper Cty Jail, 437 F.3d 791, 795 (8th Cir. 2006) (finding prisoner's disagreement as to proper anti-seizure drug did not establish deliberate indifference).

12

Amendment"); Wester v. Jones, 554 F.2d 1285 (4th Cir. 1977) (negligence is insufficient to demonstrate deliberate indifference to a serious medical need); see, e.g., Patterson v. Lilley, No. 02 Civ. 6056, 2003 U.S. Dist. LEXIS 11097, *16 (S.D.N.Y. June 30, 2003) (changing medication, lowering dose and taking inmate off medication for a period of time is properly characterized as difference of opinion rather than deliberate indifference).[10]

*B. July 3, 2019 Seizure*

Plaintiff's assertion that the Defendants intentionally delayed transporting him to Maryview in the hope he would "expire" is unsupported by any facts. Delay of, or interference with, medical treatment can amount to deliberate indifference. See Formica v. Aylor, 739 F. App'x 745, 755 (4th Cir. 2018); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). However, there is no Eighth Amendment violation

> unless "the delay results in some substantial harm to the patient," such as a "*marked*" exacerbation of the prisoner's medical condition or "frequent complaints of severe pain." See Webb v. Hamidullah, 281 F. App'x 159, 166-67 (4th Cir. 2008) (emphasis added); see also Sharpe v. S.C. Dep't of Corr., 621 F. App'x 732, 734 (4th Cir. 2015) ("A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." (internal quotation marks omitted)).

---

[10] Courts have generally found Eighth Amendment claims based upon a doctor's determination of a dosage level or the type of medication prescribed do not constitute deliberate in difference. See Phillips v. Jasper Cnty. Jail, 437 F.3d 791, 795 (8th Cir. 2006) (prescribing both the wrong type and dose of an anti-seizure medication to an inmate was malpractice but not deliberate indifference); Boyett v. County of Washington, 282 F. App'x 667, 674 (10th Cir. 2008) (substituting an alternative medication is not a constitutional violation because inmates are not entitled to particular courses of treatment); Steele v. Weber, 278 F. App'x 699, 700 (8th Cir. 2008) (no deliberate indifference to medical needs where prison doctors adjusted dosage level of medication based upon inmate's pre-incarceration levels of medication, medical history, numerous tests and "continuously tried different methods and medications to treat [inmate's] pain"); Jolly v. Knudsen, 205 F.3d 1094, 1096-97 (8th Cir. 2000) (increasing dosage of medication, to address perceived difficulties in plaintiff's dosage level, was not deliberate indifference); Dulany v. Carnahan, 132 F.3d 1234, 1240-41 (8th Cir. 1997) (administration of lithium to an inmate without testing, which resulted in blood levels exceeding the recommended standard, was not grossly inappropriate or evidence of intentional maltreatment); Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997) (disagreement with medical treatment provided does not state an Eighth Amendment claim for deliberate indifference to serious medical needs). The Fourth Circuit recently affirmed a grant of summary judgment where a doctor that monitored and adjusted an inmate's care based upon test results demonstrated concern for the inmate's "medical well-being" and did not warrant a finding of deliberate indifference. Hixon, 2021 U.S. App. LEXIS 18077, *11, ___ F.3d at ___.

13

Formica v. Aylor, 739 F. App'x 745, 755 (4th Cir. 2018). Substantial harm may also be "a life-long handicap or permanent loss.'" Coppage v. Mann, 906 F. Supp. 1025, 1037 (E.D. Va. 1995) (quoting Monmouth Co. Corr. Inst. Inmate v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987)). "[T]he length of delay that is tolerable depends on the seriousness of the condition and *the ease of providing treatment.*" Id. at 758 (quoting McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010)) (emphasis added).

Here, the record establishes that Plaintiff was found at 9:20 a.m. on July 3, 2019 and within two minutes medical personnel provided aid. By 10:05 a.m., Plaintiff had been moved to the medical unit, was given his morning medication (Depakote and Vimpat), and was under observation and being monitored by the Defendants. At 11:05 a.m., Plaintiff began to suffer "consecutive seizures" and Dr. Moreno initiated the emergency transport protocol [Dkt. Nos. 33-2 at ¶ 9; 33-3 at ¶ 7], and Nurse Hodge called 911 for an ambulance. Plaintiff arrived at Maryview at 11:53 a.m., and Maryview began treatment at 12:20 p.m. Plaintiff argues that the delay at HRRJ by the defendants was almost three hours (from 9:20 a.m. through 11:53 a.m.) [Dkt. No. 44-2 at 1].

Although Plaintiff argues that there was a three-hour delay by the defendants was intentional conduct "in a life-threatening emergency situation" [Dkt. No. 39 at 24] — neither the length of the delay he attributes to the Defendants nor his assertion of a life-threatening situation are supported by the facts. The Defendants' evidence indicates that he was kept at HRRJ for observation until he began to suffer "consecutive seizures" at 11:05 a.m., and at that point they executed their emergency protocol and transported Plaintiff to the emergency room. [Dkt. Nos. 33-2 at ¶ 9; 33-3 at ¶ 7]. Plaintiff has offered no evidence that there was a need to transport him from HRRJ to Maryview before 11:05 a.m.

14

Even after 11:53 a.m., when Plaintiff arrived at Maryview, the medical records submitted by Plaintiff do not reflect that Plaintiff was in a life-threatening situation, see supra at 6, and the record establishes that the delay attributable to the Defendants is less than 2 hours. First, Plaintiff avers that it is a 10-minute drive from HRRJ to Maryview. [Dkt. No. 39 at 7]. Accordingly, it took 48 minutes[11] for an ambulance to respond, load Plaintiff and drive to Maryview, and unload Plaintiff at Maryview. If the 48 minutes are not "delay," but the time for an ambulance to respond and transport, the portion of the "delay" attributable to HRRJ medical personnel is approximately 105 minutes, or less than two hours.[12]

Second, and completely ignored by Plaintiff, the medical records he submitted do not support a life-threatening situation and demonstrate that the administration of Dilantin was delayed for more than five hours after he arrived at Maryview. A Maryview doctor interviewed Plaintiff shortly after he arrived at Maryview and ordered medications (including Dilantin), but Plaintiff waited another 27 minutes before he was triaged by a nurse.[13] Thereafter, following several failed attempts to administer the Dilantin by IV, the medical personnel at Maryview abandoned trying to administer the Dilantin by IV and gave Plaintiff 400 mg of Dilantin orally at 4:59 p.m. In other words, Plaintiff did not receive the Dilantin until he had been at Maryview for more than five hours, and 37 minutes after taking the Dilantin orally Plaintiff was discharged at 5:36 p.m. and returned to HRRJ — where he was noted to have "no acute signs of distress or complaints" and told a non-party HRRJ medical provider that he felt "much better." [Dkt. No. 33-1 at 17]. Since he raises no allegations of inadequacy regarding the delivery of medical

---

[11] The call for an ambulance was placed at 11:05 a.m. and Plaintiff arrived at Maryview at 11:53 a.m.

[12] The time between the discovery of Plaintiff at 9:20 a.m. and his arrival at Maryview, 11:53 a.m., was a total of 153 minutes. Less the transportation time not attributable to the Defendants, 48 minutes, leaves 105 minutes of "delay" that is attributable to the Defendants.

[13] Plaintiff had a chest x-ray at 12:08 p.m. but it does not appear this has any relevancy to his epilepsy and was likely done because he complained of a mild cough and congestion. [Dkt. No. 30 at 2].

treatment at Maryview, the delay at HRRJ was of no consequence.[14] In short, even if the delay was three hours instead of less than two hours, he has not established he suffered any harm, much less substantial harm, by not being transported to Maryview any earlier. See Webb, 281 F. App'x at 166 ("Delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm.") (quoting Sealock v. Colorado, 218 F.3d 1205, 1210 (10th Cir. 2000)).

*C. July 5, 2019 Reduction to 200mg/day*

Plaintiff's final claim of deliberate indifference alleges the Defendants' decision to reduce his Dilantin from 400mg/day to 200 mg/day constituted deliberate indifference. The only relevant evidence he points to in support of his claim is the July 3, 2019 discharge order from Maryview, which stated his dosage was Dilantin was 400mg/day. Plaintiff's claim that the Maryview doctor's assessment and treatment plan was better than Defendants' assessment and treatment plan does not state a constitutional violation. See Hixon, 2021 U.S. App. LEXIS 18077, *11, ___ F.3d at ___. ("disagreement among reasonable medical professionals is not sufficient to sustain a deliberate indifference claim."); White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990) (if inmate's disagreement with a doctor's professional judgment does not violate the Eighth Amendment, "then certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness."); see also United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011) (while inmate "has a right to necessary medical treatment, he does not have a right to demand that the

---

[14] See Soo Line R.R. v. St. Louis Southwestern Ry., Co., 125 F.3d 481, 483 (7th Cir. 1997) ("A plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts."). In viewing the record in the light most favorable to plaintiff, the court assumes the credibility of the plaintiff's evidence unless it is "facially incredible." Willis v. Town of Marshall, North Carolina, 275 F. App'x 227, 235 (4th Cir. 2008) (citing Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998)).

opinion of his pre-imprisonment doctor be permitted to override the reasonable professional judgment of the prison's medical team."); see, e.g., Lewis v. Proctor, No. 5:08cv167, 2010 U.S. Dist. LEXIS 2052, * 3 (N.D. W.Va. Jan. 12, 2010) (inmate's belief that the hospital doctor's treatment plan was better than the prison's does not state a constitutional violation); Oglesby v. Abbassi, No. 3:12cv194, 2013 U.S. Dist. LEXIS 125964, * 23, n. 12 (E.D. Va. Sep. 4, 2013) ("certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor"); supra note 10 (discussing adjustments to and determinations of dosage levels).

The uncontested facts in this matter establish that the Defendants treated Plaintiff's epilepsy with three seizure medications. After a blood test on June 13, 2019, the Defendants discontinued one of the three seizure medications (Dilantin) because his blood serum level indicated the possibility of coma. On July 3, 2019, Plaintiff suffered a seizure that was initially treated at HRRJ by the Defendants, who subsequently initiated emergency protocol procedures after Plaintiff suffered "consecutive seizures," and they had Plaintiff was transported to Maryview. The delay at HRRJ, as noted, had no impact on his treatment because Plaintiff did not receive Dilantin until over five hours after he arrived at Maryview because of trouble in administering Dilantin by IV.

## VI.

For the reasons set forth above, Defendants' motion for summary judgment will be granted. An appropriate order will issue separately.

The Clerk is directed to provide a copy of this Opinion to plaintiff and to counsel of record for defendants.

Entered this 12th day of July 2021.
Alexandria, Virginia

/s/
T. S. Ellis, III
United States District Judge